We need to call the first case of the morning, Weber v. McGrogan, and express our gratitude for the amicus of the court, Mr. Zerpulli, and invite you forward for argument. Thank you, Your Honor. Christopher Zerpulli from Covington and Burling. Court-appointed amicus on behalf of the appellant, Ms. Amy Weber. And I'd like to reserve two minutes of my time for rebuttal, please. The issues the court has asked us to brief and address today fall into two main categories. The first, dealing with whether Ms. Weber's appeal is timely. It is. And the second, whether the district court erred in abstaining due to the state court child custody proceedings. Let's dive right into the timeliness of this appeal, right? Because that's a serious problem in the case. Now, we've looked at your briefing, but I got to ask, how, well, let me ask this. What do you think is the best of the arguments you've put forward? What's the one you think has got the best traction for why this appeal is timely? Your Honor, the best argument, in my view, is that the November 30th docket entry constituted a final decision under section 1291. This court has urged that the finality requirement requires that there be an order that leaves, quote, nothing further for the district court to do. That's exactly what the docket entry did. What does the docket entry say? The docket entry reads, civil case terminated. And it has an additional note, a clerk's note, which says, please see order docket entry number 119. So what that was doing was referring back to the order of dismissal without prejudice, which said that there were 30 days in which to file an amended complaint. Except under WITASIC, we treat these clerk-entered utility orders. There's no judge's signature associated with it. So is there any order here? I don't see it. First, Your Honor, I think WITASIC is not on point. WITASIC did not address the 1291 finality requirement at all. But it did talk about these exact kind of entries and how to deal with them, right? It said there are text orders, there are utility events, there are minute entries. If we look at how WITASIC talked about it, doesn't this fit right into a utility event category and not a text order? Under the circumstances of this case, no, Your Honor. The docket entry was made only one day after some of the defendants in this case filed a letter request that the court dismissed the case with prejudice. I think that's exactly what the court was purporting to do. But the court didn't do it, right? The clerk did it. It's a clerk entry that says, case terminated. Is there any indication that the court acted upon this and not that this was just what WITASIC says, which is a utility event, that is the clerk acting to clear or clean up a docket? Well, first of all, the fact that it was in response to a letter asking the court to dismiss the case with prejudice. But further, Your Honor, I'd say that WITASIC concerns whether one of these utility entries can constitute a separate order under Rule 58. The question here is different, whether it counts as a, quote, final decision under Section 1291. I think it's a helpful distinction that you're drawing, that there's finality and there's entry under Rule 58. But that seems to cut against your Rule 58 arguments elsewhere in the brief. I mean, I think we first have to figure out that there's something final here, right? And we've got this issue about the June one as a dismissal without prejudice. Now, we get past the time of lien to amend, but we don't have anything after that. We don't have, we have this question about whether to use the stand on a complaint rule. But I understand your arguments are trying to distinguish WITASIC, but this does look a lot like what WITASIC wants to treat as just not qualifying as an entry at all. And I, if it's not an entry, is it going to be final? What's your argument that it can be final, even though it's not something by the court, not signed, not being entered? Well, I think if the docket entry doesn't constitute a final order, then there, or excuse me, a final decision, then there was never a final decision in this case. And if I may bring up... How about your alternative argument? I thought you had an alternative argument, which is there's a final decision in the ripening of the dismissal without complaint. Is that not a final decision? I mean, does, did it not become a final decision by virtue of the passage of time and her decision to appeal rather than to amend? No, Your Honor. Under WRS, this court has said that parties need a definitive way of knowing if and when their case has been dismissed. And I think the history of this case aptly illustrates the importance of this principle because it wasn't clear to Ms. Weber at all whether she was too early or too late. Doesn't that mean there's no final order then? If we agree with what you're saying, then there is no final appealable order. And this matter is really still properly before the district court. I mean, doesn't, doesn't your proposition lead to that conclusion? No, Your Honor. It leads to the conclusion that Ms. Weber still has the option and she still had the option in December of 2016, when she filed her second notice of appeal, to stand on her complaint and bring the case before this court. There had to have been a final order, right? You can't have that both ways, Mr. Cipolli. Either there is a final order or there isn't a final order. If there isn't a final order, then she's here too soon because there's no finality. If there is a final order, then the final order must be the dismissal that occurred on June 9th without prejudice as ripened into a final order, a dismissal with prejudice, because she chose to stand on her complaint. I'm not, maybe I'm being obtuse here, but I don't see how you can, you know, it's got to be one or the other. I'm not sure how it's, how you got a third way, which is there's no final order, but we can appeal. Respectfully, Your Honor, it's not having it both ways. This court has held that as a matter of efficiency, a plaintiff can decide to stand on a complaint rather than sort of going through the extra step of having a dismissal with prejudice. That's in the context of a final order, right? You stand on the complaint because what happened in the district court was the district court said, I'm dismissing this case, but I'll allow you to amend if you want to. That's what the district court said here. Why isn't June 9 in effect the final order? I mean, it seems like the best you can argue for is it didn't become final until she chose not to appeal. I mean, chose not to amend, but why isn't a dismissal, even if it's a dismissal without prejudice, the event you have to tie your boat to? Well, first of all, it seems like that was a, you know, if that's the case, it was something that was not only confusing to the letters with this court stating that the first notice of appeal was premature and to the clerk of the court who notified Ms. Weber that the case was subject to dismissal based on a possible jurisdictional defect. So I think what this is highlighting, and that's a good point, that there's a lot of confusion and which is the bigger danger here? If we go ahead and turn a bunch of these into final orders, are we going to box people out of court by being too late? If we, what's the downside if we err on the side of saying these aren't final orders? We're going to wait until the district court dots all its I's and crosses all its T's here? Your Honor, I think that's absolutely the best practice. And we highlighted on page eight of our reply brief, a couple of cases where courts in this... Stop. He gave you two things and you say, that's the best practice. I got to keep up with you. Which is the best practice? For the court to enter a separate order of dismissal with prejudice to make it crystal clear to litigants and to give a bright line that this is when your deadline to appeal starts to run. This is when the 30 day clock starts to run. Surely that's the best practice, but is that answering the question about what's the biggest downside here? Which is... The biggest downside is certainly that litigants don't have, as this court said in WRS, a clear signal about what's going on. And so they run the risk of being untimely because they're not sure whether they need to file or whether their notice of appeal is premature. So that's the big downside risk. There's no downside risk in my view to requiring courts to enter a separate notice of dismissal with prejudice, which was never done here. Now, Judge Jordan said there's a dichotomy here. Either it has to be final or it's not final. I'm wondering about how this stand on my complaint rule operates, because that's a judge created rule. Is that something that's discretionary? We've found cases in which this court has taken jurisdiction because of it. I haven't found any cases in which we've said something was untimely or rejected a case because of it. Are you aware of any authority that that might be discretionary? I'm not aware of any authority whether or not it's discretionary. But I think it's a permissive rule. What this court said in one of those cases was that they would just be forcing the litigants to go to an extra step if they rejected the appeal and forced them to go to the additional step. But I don't think that means that litigants should have to appeal from a dismissal without prejudice, because that doesn't give them a clear signal that their time has begun to run. But the rules, Rule 58 embodies, it addresses the issue you're dealing with, doesn't it? Rule 58 says if there's no separate order entered that definitively says you're done, well, then we'll another 150 days in which to file your appeal. And that is the basis on which the rules acknowledge maybe there could be some vagueness here, but if you blow it because you're unsure, there's your window. But that is the rule. Yes, and Your Honor, we've explained in our brief, and this is our third independent argument for why the appeal is timely, that if she gets the 150 days, and she certainly does, then this appeal was timely because under our calculation, that takes her through to that time. There's a problem, though, in that the Rule 58 speaks expressly about 150 days from the entry on the docket. There is no docket entry on July 9th. The docket entry is June 9th. So I don't see how you can run the 150 days from July 9th. Well, I think the time should run from when the dismissal was with prejudice, and it was not with prejudice on June 9th. How do you get around the entry in the languages, entry in the civil docket? How does that work? I mean, maybe it doesn't work. Maybe the argument is when this judge-made rule about standing on your complaint is operative, you have to add 30 days to the entry in the docket. But is there any authority for that approach? Because that's the approach you're urging on us. Yes, yes, I am. And again, you know, the relevant entry here, I think, you know, there isn't one that says there is a dismissal with prejudice, but that's when the clock should begin to run, not when there's a dismissal without prejudice. What's the authority for that proposition that you're urging? I'm not aware of any, Your Honor. If I could, in my remaining 12 seconds, I think the district court's analysis on Rooker, Feldman, and Younger was clearly erroneous and used outdated tests that have since been disapproved by both this court and the Supreme Court. I think that's absolutely clear, and I'll be happy to address that more on the rebuttal. Thank you very much, Mr. Cipollone. And Mr. Sarno, we'll hear you on behalf of that. Good morning, Your Honors. And may it please the court, I'm Deputy Attorney General Michael Sarno. I represent Judge Francis McGrogan, former New Jersey Governor Chris Christie, and literally 30 defendants in this matter. We ask first, as Your Honors know, that this court find that it lacks appellate jurisdiction for many of the reasons which Your Honors were questioning my adversary on. What's the final order here? The final order, Your Honor, would be the 30 days after the June 9th. That would be the final order. It was in conjunction, if we look at the Badoff case from this court. Your position is that we should give them 30 days, and we should consider that 30 days later, July 9th, to be effectively the date of a final order? Well, I'm going off the consistency with the Badoff case. I believe that in conjunction with Ms. Weber standing on her complaint on June 29th. Doesn't that mean there's jurisdiction? Because if you give her the July 9th date, and then you say you've got 150 days from July 9th, and you move that out to early December, then beginning in that early December timeframe, does she have, in effect, 30 days to appeal? No, Your Honor. That is two different things. If we're looking at it under the Rule 58, then it starts from June 9th. Your Honor asked when the final order for purposes of our 30 days would begin. That would have begun on July 9th. They have to work together, don't they? You can concede, wouldn't you, that there's no separate order as envisioned by Rule 58? There was this memorandum of opinion, dismiss without prejudice on Ricker, Feldman, or Younger, but there's no separate order saying dismissal. That's why we're here, right? That's when Rule 58 kicks in. So if Rule 58 kicks in and July 9th is the date, she should be timely, shouldn't she? But for the fact that she chose to stand on a complaint. Okay, so we've got this question. The cases you cite are ones in which we found a jurisdiction because someone had stood on a complaint. Yes. But are you aware of any authority in which we found something was untimely and rejected jurisdiction because someone had earlier stood on a complaint? I can't find authority like that. Have you? Your Honor, I haven't. Just so we're clear, you're asking whether there's authority with regard to when someone chooses to stand on a complaint. We clearly can accept standing on a complaint as an efficiency-based jurisdictional basis, even though it doesn't comply with the formal rules. But must we? Are you aware of any case that said we had to do it or we rejected a case as untimely because someone had erroneously stood on a complaint as here? Well, no, Your Honor. I'm not aware of that. However, if we did move to that, then it would create, I think, even more uncertainty. I think that there's two avenues to go. Either once she chooses to stand on her complaint, at that time, that's when we have the quote-unquote for purposes of the rule, the final act, the final order. However, let's say that she doesn't choose to stand on her complaint. That's when we have the definitive events where litigants can know, because that's really why we're here, is we want to make sure litigants in the Third Circuit understand. What's the definitive thing here that makes it unequivocally clear to litigants? Is there anything in our record here that would prevent any possible confusion? I mean, it looks like Ms. Weber herself was confused. It looks like some of you folks were confused. There were letters saying, hey, give us a definitive ruling, right? Your Honor, well, I can't speak for my co-counsel and Ms. Weber, but the point is- I'm not asking you to speak for her. I'm just asking you to acknowledge that the record shows there was at least some confusion on behalf of some defendants because there are letters saying we would like to have a definitive ruling. They didn't think there was a definitive ruling, right? Well, Your Honor, again, I think we want to keep this into what was objective. Yes, if there was a little research done with Badoff and Hagen from this court, then they would have known that once she chose to stand on her complaint, which was directly the situation in the Badoff and Hagen cases, then my co-counsel would have known and Ms. Weber that what she did was definitive. Well, what are we to do with, or if anything, think about our own clerk's office, meaning our court's clerk's office writing to the parties and in effect saying there may be a jurisdictional problem here because there's not a final order, which seems to have been what prompted Ms. Weber to withdraw her appeal. I mean, is that a historical fact that should feature in our thinking on this case? Well, I think, Your Honor, to that comment, I think that what's not getting enough play, factually in this case, is this court's clerk, October 7th, 2016 letter, which says to Ms. Weber, you know what? We're no longer listing it as possible jurisdictional dismissal. And what's interesting is 24 days later, Ms. Weber knowing that- I know you'd rather talk about the October 7th letter, but I want you to talk about the other one. That's why I asked the question about it. Sure. If we're trying to make sure that people understand definitively what their rights are and they don't lose rights to review because of confusion, do we have to be concerned that we may have added to confusion? Might we be stopped? Might we have represented, in essence, that we're not treating it as standing on the complaint as a final? I would say absolutely not for two reasons, Your Honor. One, because it says it's listed for possible dismissal. And I would also, for the second reason, I would ask, Your Honor, as I think Your Honor said in the order, we can look to the Feudernick case in the Sixth Circuit and the Burroughs case, which both kind of- But we don't say to litigants, especially pro se litigants, hey, we might dismiss this for lack of jurisdiction, but you should go research law in the Sixth Circuit to figure out whether we really mean this. Understood. But what I was looking at for those cases is I think Burroughs frames the issue pretty precisely, which is you can choose to surrender or you can choose to do your research and fight. It just says the court notice said it's impossible. And then, in fact, as I said, the October 7th letter retracted that. So here, Ms. Weber chose to surrender. That's not Your Honor's fault. That's not our fault. She chose to surrender. So now she voluntarily withdrew it, which she did not have to, and she needs to stand on the complaint. If we don't do that- She needs to stand on the complaint? Okay. Yes. Let me ask it this way. Sure. If in the course of those events we were to look at that and to say, it may appear that she had thought she would stand on her complaint, but we pushed back and she said, well, I guess I'm not going to stand on my complaint. Yes. Would we be in the posture of then, again, having no final order yet? If she pushed back and said, no, I'm not going to stand on my complaint, Your Honor? Yes. If we said, we're looking at this and given this course of events, we're going to look at this and say, because there's no, this is all reading into her actions and intent. If we look at it and we say, well, it looked like she was going to stand on her complaint, but we pushed back a hypothetical, I withdraw. I'm not going to stand on that complaint. Then we're back to no final order and a premature appeal, right? I don't believe so, Your Honor, because again- Why not? For two reasons, Your Honor, because she had already done that and so- Don't fight the hypothetical. Sure. Sure. No, no, I'm not. Hypothetical isn't for you to change. The question is, if we were to view her withdrawal as a do we have, this goes back to Judge Beavis's point, and we have the discretion then to say, well, it looks like she's not standing on our complaint. If we do have that discretion, doesn't that mean there's no final order? No, Your Honor, because then we would go, we would then kick back to Rule 58, which would be 150 days from the June 9th order, which would carry out- The 9th order. The June 9th order. Yes. Yes. There is no June 9th order. There's a June 9th opinion. That's the whole point. There's not an order that says dismiss. There's a June 9th opinion dismissing without prejudice, which we ordinarily treat as non-final. That's our letter from the clerk. Correct, and that's why the rule says it's 150 days from the entry. It doesn't say order, so that it would be 150 days from the June 9th, so in Your Honor's hypothetical, her appeal would still be- No, in my hypothetical, it's a non-final order. You're turning it into a final order in order to make your argument. I'm trying to get you to stick with this hypothetical. Yes, Your Honor. If we look at it that way, the way I've described, then June 9th is a non-final order, is it not? The actual June 9th would not be, but it would be the start of the 150 days, which then would be turned into the, for purposes of the appeal, the finality on November 6th. What authority do you have for the notion that 150 days runs from a non-final order? That's from a final order, not a non-final order. Your Honor, I'm just ... The language of the rule says 150 days from the entry, so the entry here, the last event, the last entry- There's no requirement to take an appeal unless you have a final order entered. If it is non-final, if we do not treat or are not bound to treat her statement as standing on a complaint, in Judge Jordan's hypo, she's, I think I'm going to stand on the complaint. Oh, I've changed my mind. Maybe your position is that's irrevocable once you say you're standing on your complaint. But in his hypo, if it's not irrevocable, there's no authority that says it's irrevocable, she takes it back. There's no final order at all. Or the other alternative is maybe in December 29th, the second notice of appeal, she's finally standing on a complaint again, and then it's timely. Well, Your Honor, then I would say to that, Your Honor, again, so that we can have some decisiveness so that litigants can understand when the time to appeal would run, then we would have to look to Rule 58, which would be the 150 days. So then she would have 30 days from the November 6th date. I think if we're looking for something that's decisive so people are not confused, it seems a little odd to adopt a rule that very clearly was in the face of her confusion and not what she was saying. It's a hard thing because you want a bright line, but I'm not sure how Rule 58 is giving the bright line when we don't have something that's a final judgment in the first place. Maybe we should be giving you a few minutes here to talk about the merits, because unlike your colleague, you won't get to stand back up. Looking at Rupert Feldman, it looks like the district court used some of that inextricably intertwined language, which we have later said in post-Exxon is just no longer good law. Isn't that a problem? It's not, Your Honor, for two reasons. First, to address Your Honor's initial point. In Great Western, this court had said that inextricable intertwining was not a separate prong, but it's a descriptive label. Has no independent meaning. Has no independent meaning, correct, that has to be met. However, it's still a descriptive label and useful, but even so, Your Honor, it's helpful, I think, as a tool in this case, as a district court found, because many of Ms. Weber's claims are so riddled with, you know, even the ones that Your Honors may on the surface find to be or appear to be independent. They're so riddled with the one thing, which is the removal of her child. You said many, right? But not all of them challenge the judgment. I mean, the stuff about the conspiracy to deprive her of a fair trial or praying in Hebrew or speaking Spanish, these are, they're separable. I mean, some of them might be, but not all. And the district court just lumped them all together. Isn't that something that needs to be sorted out more carefully without the inextricably intertwined as a separate requirement? Well, but either way you go, Your Honor, that would be, it would still come to the same result. I mean, if Your Honor mentioned the conspiracy, if you look at it, I think it's paragraph 174 of a complaint, she's talking about the conspiracy to unlawfully remove her child. Everything is divulging into the removal of her child. Your Honor, you didn't make this argument, but we have some law that says, you know, if claims are so fanciful that they amount to being insubstantial, then we don't have subject matter jurisdiction. And the notion that all the judges in New Jersey and Governor Christie and Senator Menendez and everybody else is out to get her, you know, all due respect to her, I understand she's got some strong feelings here, but that's, those are the kinds of claims that we've looked at before and said, well, we just, you know, there's nothing that warrant that. And we don't even dignify it by exercising jurisdiction. I'm wondering why that argument never emerged, at least as to the conspiracy. Well, Your Honor, I would say two points on that as my time is running out. We can look no further than the Great Western, which ironically, in explaining when Rooker-Feldman would apply, used this very example of a father terminating his rights and then bringing federal substantive claims, which is exactly what Ms. Weber is doing. On a second note, Your Honor, Ms. Weber's claims, I think is more akin to the rules were unfair. The process was unfair because I lost as opposed to the rules or the process was a conspiracy and it was unfair. Some of her claims, and I'm frank to say, you know, I spent time on the complaint, trying to understand what's going on. As I did too, Your Honor. And we do have an obligation to construe liberally because it was a pro se filing. But some of those claims, they don't look like they flow from the state court judgment, which is a crucial element of Rooker-Feldman. They seem like they're statements about, now, whether we've got subject matter jurisdiction or there's immunities or it's rightly here or not, it just didn't seem like it was Rooker-Feldman land because they were statements about, hey, this person committed malpractice. That doesn't have to do with the state court judgment or there was a fraud on me. That doesn't have to do with the state court judgment or I was wronged because of this state actor, not because of the state court judgment, but things preceding the state court judgment. So they couldn't be wrongs flowing from the state court judgment. They were prior to. Aren't those things that a district court ought to look at in the first instance and actually, and folks ought to engage on and say, well, it's not Rooker-Feldman, Your Honor, but there's absolute judicial immunity for Judge McGrogan. Or that's not Rooker-Feldman, but there's no subject matter jurisdiction here because there's no diversity and this is straight up a state law claim. Or there's not Rooker-Feldman, but there's no claim here under 12b6. That's the kind of analysis we're used to seeing. Should the district court have to wrestle that to the ground? Your Honor, my time is up if I may respond. I wish you would. Okay. Your Honor, with regard to, so the answer would be in this case, no, it's not necessary. So Your Honor brought up the therapist malpractice. That was already considered by Judge McGrogan. I mean, if you look at the paragraph 218 and 219 of the complaint, she raised a lot of these issues. And what did Judge McGrogan find? She found in the course of her findings, which is at, I think, 211 and 235a in the appendix, children's aid appendix. She says, I see this therapist. This therapist is qualified because of this. This therapist made these findings. This therapist is credible. So in essence... That's great. Judge McGrogan did that. Yes. But Judge Cecchi, the case we're reviewing, said Rooker-Feldman. That's the problem, right? Yes. But isn't the purpose of Rooker-Feldman to prevent the federal court and Judge Cecchi from sitting as a state appellate court? So then in reality, if you're going to rule on the therapist malpractice, you're telling Judge McGrogan that, well, your credibility findings on this therapist and the process that you reviewed are incorrect. And so that's why I'm saying it's... Sounds like your issue is with the Supreme Court's ExxonMobil case, and you would like Rooker-Feldman to be interpreted more broadly than they have. Your Honor, if I could respond. Your Honor, I would say that our position is that even after ExxonMobil, in this case, ExxonMobil wants the Rooker-Feldman to be narrowed, understood, but not in cases, as Great Western gave the example, not in cases where a litigant like Ms. Weber is merely attempting to get... She's filing in the state appellate court. She's filing in the federal court. She wants two bites of the apple. This is precisely where Rooker-Feldman was meant to prevent. And ruling otherwise, I think, would actually undercut the Rooker-Feldman doctrine. All right. Well, thank you very much, Mr. Sarno. And I know that there were many appellees that wanted to stand, but you've represented them well. Thank you for taking the time to do that for us. I appreciate that, Your Honor. Thank you. Holey, your rebuttal, please. Thank you, Your Honor. If I may pick up where the last colloquy left off and talk a little bit about how narrow the Rooker-Feldman doctrine is, post-ExxonMobil from the Supreme Court in 2005. The second element of Rooker-Feldman is whether the plaintiff is complaining of injuries caused by the state court judgment. The test is not whether the plaintiff has injuries caused by the state court judgment. I think it's fair to say that's the case in all of these reported cases we've discussed in our briefs. But this court has made very clear in Great Western Mining that Rooker-Feldman doesn't apply if the plaintiff is lodging a complaint against a violation of some independent right. Understood. Let me ask you a question, though, about assuming you're right, and that this Rooker-Feldman and Younger were both erroneous bases on which to dismiss this case. And assume you were right that we have appellate jurisdiction here. Are we free to ourselves, as a matter of law, look at the complaint and say, look, Rule 8 says you've got to have a plain, simple statement of your claim. This is the farthest, this 150-plus page complaint, which is, you know, quoting from letters that she wrote and excerpting from multiple cases and giving us, in effect, head notes and a kind of a stream of consciousness. So the frustrations she felt, she was clearly frustrated and angry in the system, and that comes through very clearly. But it's definitely not a clear and concise statement of her claims. Are we free to say, okay, we've got jurisdiction, but we don't need to send this back to the district court. If nothing else, this fails under 12b-6. She does not have a stated claim, and she stood on her complaint. So we're done here. Respectfully, Your Honor, I don't agree that the complaint isn't clear. I've read it, thoroughly, myself. I'm not sure whether there's authority, one way or another, on whether it would have to be remanded or whether this court could just, as a matter of law, evaluate the sufficiency of the complaint, because that wasn't one of the five issues that we were asked to evaluate. But I think that the, you know, for whatever it's worth, that the complaint... I pulled that one out. That's all right, Your Honor. But, you know, regardless, I think, as it affects the issues we're talking about, there are substantial allegations here that, for example, the state of New Jersey had inadequate policies, that defendants made baseless and retaliatory claims that influenced the state judgment, and that there was a failure to investigate allegations of child abuse. And these are exactly the kinds of claims that this court has held in reported decisions, such as Allen v. DiBello, BSV Somerset County, and Moran v. Moran, do not engage the Rooker-Feldman doctrine, because they're targeting independent constitutional violations and torts, regardless of whether they influence the court's decision. It's an independent claim. And, you know, the Rooker-Feldman is also not met. We got you. We had your briefing on that. Okay, my colleagues, any further questions? All right. Thank you again very much for taking this matter up pro bono. You've served your client well, and we'll take the matter under advisement. Thank you.